ELLIS, Judge.
This is a suit for partition by licitation of the following described property:
5 acres to be taken out of the Southeast corner of NE}4 of SW}4 Sec. 5 T 3 S R 7 E, said 5 acres to be surveyed so as to be equal on all sides and is same property acquired by Henderson Mackey from Annie B. Creevey in Donation Book 1, pg. 48, the heirs of Pauline Mackey acquired one-half interest therein by judgment in COB 198, pg. 695, and heirs and legatees of Pauline Mackey recognized in judgment recorded in COB 195, pg. 238.
in which plaintiff alleged it was the owner of an undivided % interest and that Ruthy Mae James was the owner of the other undivided Ys interest.
Plaintiff alleged that it had acquired its undivided interest from Ermyntrude Part-er Cutrer, Paul Ferguson and Gladys (Ferguson) Fortinberry, as heirs of Henderson Mackey, deceased, by deed dated February 18, 1951 and recorded in the records of Tangipahoa Parish, and that although said deed called for the entire property, defendant “has a claim” on a % interest therein as she acquired same under the terms of a will from Pauline Mackey, deceased, who was the owner at the time of her death by inheritance from her deceased father, Henderson Mackey, of an undivided 1/2 of the above described five acres. Plaintiff alleged the indivisión of the property and asked that it be sold in order to effect a partition and further asked for attorney fees in the sum of $100 for effecting the partition, to be borne by the mass and paid prior to the division of the proceeds of the said sale.
The defendant entered a general denial to all allegations of plaintiff’s petition setting forth its ownership and acquisition of said property, and by way of further answer set up ownership in herself of 4.54 acres which it was shown on the trial was a portion of the same property but was surveyed in accordance with old fences surrounding it. The defendant alleged that she had inherited this property from her “deceased grandmother,” Pauline Mackey Rankin, by last will and testament which had been duly probated, and that she had further acquired the % undivided interest each of Paul J. Ferguson and Gladys C. Ferguson Fortinberry by deed of record in COB 198, page 472. The defendant further alleged that the description of the property in the deed was incorrect and also in the succession of Pauline Mackey Rankin but that the descriptions in both the deed and succession proceedings “are being corrected accordingly.”
The defendant charged the plaintiff with moral and legal bad faith in purchasing the property from Ermyntrude Parter and Paul Ferguson and Gladys Fortinberry because it allegedly knew or had every reason to know that the property was the same that Pauline Mackey Rankin left to defendant, and defendant therefore claimed a title superior and more ancient than that of the plaintiff.
*168 In the alternative defendant alleged: “* * * that plaintiff’s claim through Ermyntrude Parter Cutrer, who is an illegitimate child of Leathy Jiles and that Leathy Jiles, in turn, was an illegitimate child of Henderson Mackey being born out of wedlock and further, that the said Er-myntrude Parter Cutrer never went by the name of Jiles and Leathy Jiles, who claims to be a descendant of Henderson Mackey, never went by the name of Mackey as she was born out of wedlock.” Defendant further claimed open, civil, corporeal and peaceful possession together with Pauline Mackey Rankin of the property in dispute under ten and thirty years “under color of title, and by actually living thereon peacefully as against all the world * *
Defendant also filed an exception of no cause or right of action prior to its answer which was referred to the merits by the trial court and which has been abandoned as it is not mentioned in the brief.
After trial there was judgment in favor of plaintiff and against the defendant in which the plaintiff was decreed to be the owner of an undivided % interest and the defendant an undivided % interest and the property was further adjudged to be indivisible in kind and ordered sold at public auction with appraisement after due advertisement according to law by the Sheriff of Tangipahoa Parish, the proceeds of the sale to be referred to the Clerk of Court to complete said partition. It was further ordered, adjudged and decreed that all costs of this proceeding and attorney fees in the sum of $100 for effecting the partition be borne by the mass and paid prior to the division of the proceeds of the said sale.
From this judgment the defendant perfected a devolutive appeal which was heard by this court and a motion to dismiss was sustained, see 71 So.2d 709, but writs were granted by the Supreme Court, 226 La. 303, 76 So.2d 311 which held that this court was in error in sustaining the motion to dismiss as the full amount for which the property was sold in accordance with the judgment in order to effect a partition had been paid into the registry of the Court “where the funds are now held pending final decision”, and that, therefore, appellee’s rights as against plaintiff-appellant “are relegated to the proceeds of the sale.” In other words, the question presented to this court now is whether the defendant is entitled to the entire amount of the funds or whether, as contended by the plaintiff, it is entitled to only an undivided % less costs and attorney fees.
It is shown that Henderson Mackey acquired the five acres heretofore described by donation on the 25th day of September, 1888 and that on the 27th day of June, 1900, Leathy Mackey, alleged daughter of Henderson Mackey, acquired the following described property:
“Five certain acres of land with improvements thereon and the rights, ways, privileges, servitudes and advantages thereto belonging or in anywise appertaining, situated in the State of Louisiana, in the Parish of Tangipahoa, formerly St. Helena Parish, which five acres together with five other acres previously acquired and now owned by said Henderson Mackey, comprise together the southeast Quarter of Northeast Quarter of Southwest Quarter of Section Five, Township Three south Range seven East, Greensburg Land District.”
Considering the description of the property which Henderson Mackey acquired and which Leathy Mackey acquired, the vendors intended that Henderson Mackey acquired the east half of southeast quarter of northeast quarter of southwest quarter of Section Five, T 3 South Range 7 East, while Leathy Mackey acquired the West ■half of Southeast Quarter' of Northeast Quarter of Southwest Quarter of the same section, township and range.
The defendant by her answer and on the trial in the District Court attempted to vary and correct the description of the property in question and also plead prescription. ■ Those two questions are. not before this court due to defendant’s failure *169 to take a suspensive appeal and as held by the Supreme Court, “the salé was actually consummated pursuant to the judgment, such sale was valid and the appellee’s rights against Fluker Farms, Inc. are relegated to the proceeds of the sale.”
Henderson Mackey and Caroline Mac-key had two children, Leathy and Pauline. The defendant alleged that Leathy was illegitimate but the record amply supports the contrary, as the testimony offered by defendant is based upon hearsay of the vaguest kind. Leathy Mackey was the mother of Ermyntrude Parter, her only offspring whom the defendant alleged was illegitimate. Pauline Mackey upon her death left as her sole heirs two grandchildren, Paul Ferguson and Gladys Ferguson Fortinberry.
As stated, the plaintiff offered in evidence the deed whereby Henderson Mac-key acquired the five acres in dispute as well as the deed whereby Leathy Mackey acquired the adjoining five acres. The plaintiff offered a petition and judgment in the Succession of Henderson Mackey in which Leathy Mackey and Pauline Mackey were recognized as the sole and only heirs of the deceased, and Ermyntrude Parter Cutrer was recognized as the sole and only heir of her mother, Leathy Mackey Jiles, and Paul Ferguson and Gladys Ferguson Fortinberry were recognized as the sole and only heirs of their deceased grandmother, Pauline Mackey Rankin. Ermyn-trude Parter Cutrer was recognized as the owner of an undivided one-half interest and Paul Ferguson and Gladys Ferguson Fortinberry of an undivided ^4 interest each, in and to the five acres in dispute and heretofore described. This judgment was dated December 7, 1950, and on the 18th day of February, 1951 Ermyntrude Parter Cutrer, Paul Ferguson and Gladys Ferguson Fortinberry, for a consideration of $500 cash, sold to the Plaintiff, Fluker Farms, Inc., the same five acres of land.
The plaintiff, after showing an apparently complete chain of title, by deed, Henderson Mackey’s acquisition of the five acres in dispute and then offering the proceeding in the Succession of Henderson Mackey and the judgment recognizing the heirs and sending them in possession of the property in question and its subsequent acquisition thereof, closed its case. ;
When the defendant attempted to attack the legitimacy of Leathy Mackey the plaintiff made the following objection:
“I object to any reference or any evidence as to the legitimacy of Letha Mackey for the reason that she is recognized as the legitimate heir of Henderson Mackey by judgment of this Court and a judgment of this Court has to be attacked direct and not collaterally. It cannot be attacked collaterally. We have the judgment recognizing her as the heir already offered in evidence.”
It is not necessary to a decision of this case that we consider this objection.
The defendant relies upon the testimony of Sam Callihan, a Negro man who in 1952 when the case was tried was approximately 80 years of age. He testified that Leathy Mackey had married his brother and that was the reason he knew so much about her. He testified that Leathy was an illegitimate child born before Caroline and Henderson Mackey were married, however, on cross examination he stated that he did not know when Henderson and Caroline were married, that he could not “memorize that,” that he was quite a lad. His testimony with regard to Leathy Mackey is not very satisfactory, for he stated that he had! known the two daughters of Henderson and Caroline Mackey, Pauline and Leathy,. for approximately 65 years, and according to the marriage certificate of Leathy Mac-key and Emmanuel Callihan, which stated that Leathy was the daughter of Henderson and Caroline Mackey, issued on the 17th day of January, 1888, Leathy Mackey was 18 years of age. She would, therefore, have been one year older than Sam Callihan, the witness, who testified that he was born on the 18th day of May, 1871. He further testified that Leathy was younger than he was. While Callihan was probably doing the best he could, his tes *170 timony merely illustrates the fact that it is difficult to remember things too clearly after 65 years.
According to other responsible witnesses, Henderson and Caroline Mackey were considered man and wife and Leathy and Pauline • their two legitimate children.
The defendant argues that even if Lea-thy Mackey was legitimate, which is borne out by the record, that then her daughter, Ermyntrude Parter was an adulterous bastard. It is shown that Leathy Mackey was first married to Emmanuel Callihan. There is no attempt to offer any records showing a divorce nor is there any evidence as to if or when Emmanuel Callihan died, although Sam Callihan would probably have been able to answer this question had he been asked. Sam Callihan did testify that he did not think that Leathy and his brother, who was her first husband, were ever divorced. He also testified that Ermyntrude was illegitimate and at the time she was born Leathy Mackey was living with Parter.
Under the state of facts as shown by this record, Ermyntrude Parter, the only child of Leathy Mackey, would be presumed a legitimate child of Emmanuel Cal-lihan and Leathy Mackey, under Article 184 of the LSA-Civil Code which states that: “The law considers the husband of the mother as the father of all children conceived during the marriage.” We cannot presume that Emmanuel Callihan and Leathy Mackey were divorced at the time of Ermyntrude’s conception or that Calli-han was dead. There is no testimony as required under Article 189 of the LSA-Civil Code to put an end to the presumption of the paternity nor is there any testimony or record to show any contest of the legitimacy of Ermyntrude by Emmanuel Callihan as required by Article 191 of the Civil Code, nor any fact as required under the Articles of our Civil Code which would destroy her presumption of paternity.
Although we believe under the facts of this case that Ermyntrude Parter is to be considered a child of the marriage of Emmanuel Callihan and Leathy Mackey, we will discuss the testimony and jurisprudence upon the assumption that Ermyn-trude was not a legitimate child of the marriage between Emmanuel Callihan and Leathy Mackey. In order to do this it is necessary that we assume that Emmanuel Callihan had died prior to the conception and birth of Ermyntrude. Counsel for defendant apparently bases his contention that Ermyntrude was an adulterous bastard upon the fact that she was the daughter of a man by the name of Parter who had a living wife at the time of Ermyntrude’s conception and birth.
The plaintiff offered the testimony of Mrs. Susie Kent who was well acquainted with Henderson and Caroline Mackey from 1890 until their death. She testified that Caroline Mackey nursed some of her children and that her daughter Pauline cooked for her. She only knew Henderson and Caroline to have the two children, Pauline and Leathy. She could not swear that Henderson and Caroline were married but they were living together as husband and wife in 1890 with their two children. She stated that she knew nothing of either Leathy or Pauline not being the children of Henderson Mackey and that she accepted them as such for “It seemed like it was a family.” There is no doubt according to Mrs. Kent’s testimony that Henderson and Caroline were known in the community as husband and wife and Leathy and Pauline were recognized as their children. Mrs. Kent was asked if she knew Ermyntrude Parter and she testified as follows:
“A. Oh, yes.
“Q. Do you know who her mother was ? A. Lethy.
“Q. Do you know who her father was? A. Pegleg Parter.
“Q. Do you know if they were ever married? A. No, nobody knows.
“Q. As a matter of fact, you know they weren’t, don’t you? A. I am *171 not going to say that. I am not going to swear to that.”
Mrs. Kent was not asked under cross examination by counsel for defendant whether Parter .was married.
Later, the testimony of Mrs. Jennie Gordon and her daughter, Mrs. Williams,, was taken on behalf of defendant. Mrs. Gordon was 96 years of age at the time, and she had known Caroline and Henderson Mackey during slavery times. She was asked by counsel for defendant what she knew about Leathy Jiles being illegitimate and stated: “I think probably she was legitimate because she has told me about— she spoke very freely about things like that and I think she was .legitimate.” She was then asked: “Do you know anything about this Ermyntrude Parter” and answered, “The fact that she was her child and the possibilities were that she was married to that man; that she was legitimate, although I don’t know anything about that.”
Mrs. Williams testified that she knew Henderson and Caroline Mackey and that she had had a conversation with Caroline Mackey in which the latter told her that Leathy was not a daughter of Henderson Mackey. She fixed the time of this conversation as being when she was approximately 18 years of age, which was approximately 45 years prior to the trial. She testified that she did not know if Leathy Mackey had ever gotten a divorce from Callihan, however, she stated that Ermyn-trude was the daughter of a man by the name of Parter and that Leathy Mackey and Parter were never married for Parter had a living wife. The testimony of Mrs. Williams is the strongest in the entire record with regard to the question of whether Ermyntrude Parter was an adulterous bastard. However, in view of the jurisprudence the testimony is insufficient to brand Ermyntrude Parter as being either illegitimate or an adulterous bastard.
It is to be remembered that these witnesses are testifying to things that are supposed to have occurred some 40 to 65 years prior to the trial of this case. Mrs. Susie Kent when asked if Parter and Leathy ■ Mackey were married, testified: “Nobody knows,” which sums up the conclusion we have reached as to that fact. Mrs. Williams’ testimony .is clearly based upon hearsay. There is no marriage certificate nor license offered in evidence showing Parter to have been married, nor any evidence that any search was made of the records in order to definitely establish whether he had ’ ever secured a marriage license and whether he had ever been officially married. While the same might he truthfully said with regard to Leathy Mac-key Callihan’s marriage to Parter, it must be remembered that the burden of proof is upon the defendant to establish that Ermyntrude Parter was illegitimate and an adulterous bastard.
In the Succession of Tyson, 172 So. .772, 778, the Supreme Court with Judge, now Chief Justice, Fournet, as its organ, had the same question presented to it and after reviewing the former jurisprudence stated:
“We therefore conclude that the Jung [Jung v. Doriocourt, 4 La. 175] and Robinett [Robinett v. Verduns Vendees, 14 La. 542] cases are not applicable here, and that interveners could only avail themselves of the character of evidence prescribed by Article 209 and Article 210 of the Revised Civil Code to establish the paternity of plaintiffs in this case.
“Articles 207, 208, 209, and 210 of the Civil Code provide as follows:
“Article 207: ‘Every claim set up by natural children may be' contested by those who have any interest therein.’
“Article 208: ‘Illegitimate children who have not been legally acknowledged, may be allowed to prove their paternal descent.’
“Article 209: ‘In the case where the proof of paternal descent is authorized by the preceding article, the proof may be made in either of the following ways:
*172 ‘“1. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so;
“ '2. .When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such;
“ ‘3. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived.’
“Article 210: ‘The oath of the mother, supported by proof of the cohabitation of the reputed father with her, out of his house, is not sufficient to establish natural paternal descent, if the mother be known as a woman of dissolute manners, or as having had an unlawful connection with one or more men (other than the man whom she declares to be the father of the child) either before or since the birth of the child.’
“Thus it may be seen that article 207 authorizes one who has an interest to contest the claim set up by a natural child; article 208 authorizes an illegitimate child, who has not been legally acknowledged, to prove his paternal descent in order to claim the alimony authorized by article 240 of the Civil Code; and article 209 merely prescribed the method of establishing paternity ‘in the case where the proof of paternal descent is authorized by the preceding article.’ (208)
“The evidence is barren of any private writings in which Noah Tyson, Sr., acknowledged any of Louisa’s first five children, or called them his children, or that he ever, in public or in private, acknowledged them as his children or called them his children in conversation or that he helped to educate them as his own children. Interveners therefore failed to establish proof of paternity under article 209 of the Civil Code and likewise under article 210 of the Civil Code, because the record does not show that Louisa Tyson ever made oath that Noah Tyson was the father of any of her children. Moreover, she was not free of dissolute manners within the meaning and contemplation of the article.
“The trial judge excluded all evidence to establish by reputation that Noah Tyson, Sr., was the father of the first five children, but allowed, over plaintiffs’ objection, ‘first, parol evidence of statements made by Louisa Gibson that the father of these children was Noah Tyson, Sr., and second, statements and declarations made by the children themselves as declarations against interest made at unsuspi-cious times,’ and we think properly commented thereon as follows:
“ ‘to engage in what the court referred to as “scandalous inquiry” to brand a group of persons and their issue as adulterous bastards, to fasten paternity of mixed-breed whites and negroes upon a white married man, though now dead, reflecting upon his legitimate posterity, and to deprive a group of persons of the right to inherit from their own mother and ancestor, when the alleged white father’s succession is not in question, merely by fixing upon them a disreputable status, would seem to require some higher proof, some proof other than and greater than suspicion, general reputation and idle comment, even though that be based upon what human experience might indicate to one of normal intelligence, as being a probability.’
“We therefore conclude that the paternity of Louisa’s first five children has not been established, and it makes no difference whether the father is unknown or not if they were duly acknowledged by the mother. Jobert v. Pitot, supra [4 La.Ann. 305], Taylor v. Allen, 151 La. 82, 91 So. 635.”
Again in the Succession of Wallace (Wallace v. Banks), 219 La. 297, 52 So.2d *173 858, the Supreme Court through Chief Justice Fournet stated that when an attempt is made to bar one claiming from his natural mother through an attack on his paternity, evidence as to proof of paternity is restricted to that evidence permitted under the provisions of the LSA-Civil Code for the proof of paternal descent. LSA-Civ.Code, arts. 209, 210. See also Allen v. Anderson, La.App., 55 So.2d 596.
The facts in the above cited case were much stronger and more convincing in favor of bastardy than in the present case. The Court reaffirmed its holding in the Succession of Tyson, supra, in which the proof of paternity was restricted to the character of evidence permitted under Article 209 and 210 of the Code, and further stated [219 La. 297, 52 So.2d 861]:
“ * * * We adhere to this jurisprudence and reaffirm the principle that courts should be most cautious in their adjudications under facts such as are here presented. The lawmakers having seen fit to prescribe the type of evidence admissible where a child of illegitimate birth seeks to prove his paternity, we can think of no sound reason why the rule should be extended when the attempt is made to bar one claiming from his natural mother, through attack on his paternity — particularly since a relaxation of the rule would stigmatize the child for an act of which he was completely innocent, and adherence thereto does not jeopardize the rights of heirs claiming from the alleged father.
“It is true that in the instant case the evidence does, at first glance, appear to comply with one of the modes or proof sanctioned by Article 209. We nevertheless agree with the conclusions of the trial judge that the evidence should be of a more convincing type than that offered here, for, on further consideration, it is clear that the statements made by Anderson Banks to boys of such immature age, more than fifty years previous to the date of trial, are to be viewed with extreme caution, * *
Applying the requirements of Article 209 and 210 LSA-C.C. to the facts in the present case, there is absolutely no proof of any writings of the alleged father, Par-ter, in which he acknowledged Ermyn-trude as -his child nor any testimony that he either in public or privately acknowledged her as his child or called her so in conversation, nor any testimony that Lea-thy Mackey was living in a state of concubinage with the father and resided as such in his house at the time when the child was conceived. We do not have any facts to which Article 210 could be applied.
The defendant has failed to prove that Leathy Mackey was not legitimate and has failed to prove that Leathy Mackey was or was not divorced from Emmanuel Callihan, her first husband, or that the latter had or had not died prior to the conception and birth of Ermyntrude Parter, and, further, failed to prove that Leathy Mackey and Parter were not legally married, and, finally, under the articles of our Code and the jurisprudence as established bv our Supreme Court, has failed to prove that Ermyntrude Parter was an adulterous bastard.
We have not gone into the question of acknowledgment by Leathy Mackey of her daughter, Ermyntrude Parter, as it has not been raised by either counsel, and also the proof falls short of showing that she was illegitimate and required any acknowledgment by her mother to inherit under the facts in this case.
There seems to be one other question which counsel for defendant has raised, viz., that his title is superior and more ancient than the plaintiff’s. The basis of this contention on behalf of the defendant is the proceedings in the Succession of Pauline Mackey. It is shown by the offerings that Pauline Mackey bequeathed to her Godchild, defendant herein, all of the real estate “that I die possessed of.” In view of the fact that Pauline Mackey had a child who was the father of Paul J. Ferguson and Gladys Ferguson Fortinberry, the defend *174 ant obtained under the terms of the will an undivided % of Pauline Mackey’s undivided % which she had inherited from her father, Henderson Mackey. Also offered in evidence is a deed from Gladys Ferguson Fortinberry and Paul Ferguson to the defendant, Ruthy Mae James, dated Nov. 27, 1950, filed December 5, 1950 and recorded December 8, 1950 in COB 198, page 472 of the records of Tangipahoa Parish, in which the defendant acquired the following described property:
“All of our undivided interest which we inherited in the Succession of Pauline Mackey, wife of Willie Ferguson and John Rankin, both deceased being %th (One-Sixth) undivided interest each and as adjudged in the Succession of Pauline Mackey, before the Twenty First Judicial District Court, Parish of Tangipahoa, Louisiana, in and to the following described property to-wit:
“Five (5) acres of land in the Parish of Tangipahoa, State of Louisiana, being in the SE14 of the NWJ4 of the SWJ4 of Section 8 T 3 S R 7 E with buildings and improvements thereon.”
Defendant has also introduced a deed from Paul Ferguson to the defendant of date August 25, 1951 which purports to be a correction of the description as contained in the deed of November 27, 1950, and in this deed the following described property was transferred:
“All of my undivided interest which I inherited from the Succession of Pauline Mackey, wife of Willie Ferguson and John Ranking, both deceased being Ye undivided interest and as adjudged in the Succession of Pauline Mackey, before the Twenty First Judicial District Court, Parish of Tangi-pahoa, Louisiana, in and to the following described property to-wit:
“A certain piece or parcel of land lying and being in Section 5 T 3 S R 7 E, Greensburg Land District of Louisiana, more particularly described as beginning at a point 1344 feet North and 270 feet east of southwest corner of southeast quarter of southeast quarter of southwest quarter in Section 5 T 3 S R 7 E, thence along old fence north 3j4 degrees east 647 feet; north 88% east 288 feet, south 1% east 652 feet; south 89% west to point of beginning, comprising an area of 4.54 acres.
“This deed is an act of correct correcting the description to conform with the survey and possession giving the correct description and correcting the deed between the same parties dated November 27th, 1950 and recorded in COB 198, page 472 of the records of Tangipahoa Parish, Louisiana.”
Defendant has also offered a purported deed of correction same as above from Gladys Ferg'uson to Ruthy Mae James, defendant, executed on August 25, 1951 and recorded October 17, 1951.
As plaintiff acquired its alleged undivided % interest in the property sought to be partitioned on February 18, 1951, the purported title of the defendant from Gladys and Paul Ferguson on November 27th 1950 would be superior and more ancient provided it covered the same property purchased by the plaintiff from the same two heirs. As shown the title of the defendant covers five acres of land in the SE% of NWYi of the SW% of Sec. 8 T 3 S R 7 E, whereas the correct description should show the property as being in the SE% of NEY4, of SW% of Sec. 5 T 3 S R 7 E. Thus we see defendant’s description is erroneous as to the emphasized quarter section and emphasized section. Defendant’s title, however, does identify the five acres as being all of “our undivided interest which we inherited in the succession of Pauline Mackey * * * being Yq (One-sixth) undivided interest each and as adjudged in the Succession of Pauline Mackey * * * in and to the following described property to-wit
There is no testimony in the record that the plaintiff had any actual knowledge that Pauline Mackey only owned the five acres correctly described as being in Section 5. In other words, there is no proof *175 in this record that the plaintiff knew the true facts so as to constitute notice.
Therefore, the question presented is whether the first deed to the defendant was sufficiently identified by its description to constitute notice to the plaintiff. There is not one line of testimony on this question, other than the erroneous description contained in the act of sale, supra. While defendant charged the plaintiff with bad faith in purchasing the property and with knowledge of defendant’s claim thereto, no evidence was offered in substantiation of this charge.
In Quatre Parish Co. v. Beauregard Parish School Board, 220 La. 592, 57 So.2d 197, 198, 199, our Supreme Court through Justice McCaleb dealt with a case that involved alleged illegal cutting and removal of timber from property allegedly belonging to the plaintiff. It was necessary for the court to discuss and decide whether plaintiff was put on notice by registration of the defendant’s tax deed. In this case the plaintiff claimed ownership of the SV2 of SEJ4 and Sy2 of SWJ4 of Section 19, T 6 S'., R 8 W of Beauregard Parish upon which' the timber was allegedly cut. The defendant admitted the cutting of the timber by their agent but denied the trespass asserting that the School Board was the true owner of the land and, as such, had rightfully sold the timber to its vendee. The School Board’s title emanated from'a tax deed in which the property was assessed and sold as: “S.y2 S.E.%, S.y2 S.W.%, 19-6-9.” Thus the only difference in the two descriptions was that in the sale to the School Board for taxes the property was described as being located in Range 9-W instead of correctly in Range 8-W as designated in the plaintiff’s title. It was contended by the School Board that this mistake in the range was of no consequence in view of the fact that the conveyance records revealed that the only property owned by the common author in title in Calcasieu Parish was located in Range 8 which otherwise contained the same sectional and township lines and numbers. It was further maintained that under the statutory law respecting tax sales it is well-settled that an error of this sort, in the description is immaterial and that the conveyance is valid where the property intended to be sold can be readily identified.
“ * * * They assert, however, that, since they and their authors in title were third persons purchasing on the faith of the public records, they were not put on notice by the registration of the tax deed and are not bound thereby as that deed does not describe the property which they subsequently acquired.
“The point is well taken. It is rudimentary in our law that all sales, contracts or judgments affecting immovable property which are not recorded shall be ‘utterly null and void, except between the parties thereto’. Articles 2265 and 2266, Civil Code. Actual notice by a purchaser of a prior conveyance of the property by the grantor cannot be regarded as the equivalent to registration in this State. McDuffie v. Walker, 125 La. 152, 51 So. 100; Baird v. Atlas Oil Co., 146 La. 1091, 84 So. 366; Loranger v. Citizens’ Nat. Bank, 162 La. 1054, 111 So. 418; State ex rel. Hebert v. Recorder of Mortgages, 175 La. 94, 143 So. 15 and Martin v. Fuller, 214 La. 404; 37 So.2d 851. In the case at bar it appears that the tax deed under which the School Board claims was duly registered in the conveyance records of Calcasieu Parish. But, since that deed described a tract situated some five or six miles distance from the land in contest (located in Range 8 W) its registry was wholly ineffective as to third persons buying on the faith of the public records.
“The determination of whether the registry of a deed containing an erroneous description is sufficient to place third persons on notice of the conveyance, depends principally upon the nature of the mistake. If the description is faulty or vague but not so inaccurate so as to be misleading, it may serve as notice to third persons, depending upon the particular wording of the act. But *176 where, as in this case, the deed actually-described a tract of land different from that intended to be conveyed, its registration cannot be regarded as furnishing notice to third persons who subsequently acquired from the grantor under a correct description of the property. This distinction is well established in our jurisprudence; it is tersely stated in White v. Ouachita Natural Gas Co., 177 La. 1052, 150 So. 15, 17, thus:
******
“ ‘Of course where the description in the recorded deed is so misleading that it actually describes accurately some other property than that mortgaged or sold, a purchaser is not only not put on his guard thereby, but is actually put off his guard, and in such case a resort to outside evidence would have the effect not merely of making the description certain, but of actually changing the record; and this cannot be allowed. Ducre v. Milner, 165 La. 433, 115 So. 646; Sentell v. Randolph, 52 La.Ann. 52, 26 So. 797; Haas v. Fontenot, 132 La. 812, 61 So. 831; Roussel v. Railways Realty Co., 132 La. 379, 61 So. 409, 833; Williams v. Raymond, 163 La. 764, 112 So. 713’.
“So in the case at bar, in view of the fact that the tax deed accurately describes an entirely different tract of land from that intended to be conveyed, its registry was ineffective as to third persons.
“Counsel for the School Board earnestly argue that appellants’ position should not be maintained. They say that, since the public records revealed that the only property owned by Corsey was located in Range 8 West and since the property is correctly described except as to the range, appellants and their authors in title were put on notice as a casual examination of the public records would have revealed the glaring error in the range line.
“We are not in accord with this suggestion, which is unsupported by authority and disregards, we think, the fundamental necessity for strict adherence to the law of registry. Appellants and their authors in title were bound only by Corsey’s prior alienations of the land, located in Range 8 W., to which they obtained title; no duty in law was imposed on them to determine whether Corsey owned the tract of land described in the tax deed, which lies some five or six miles from the land in contest, nor were they required to conclude that, when Corsey’s land (of similar dimensions but described as being in Range 9) was adjudicated for taxes a mistake was made in the tax deed and that the land actually intended to be adjudicated was that in Range 8.”
See also Rouyer v. Harrison, La.App., 58 So.2d 753.
We conclude that under the above authorities on the face of the deed itself the description is so different that it does not constitute notice to third parties and that plaintiff, who purchased by a correct description, acquired title to the property described therein.
We therefore hold that the plaintiff was the owner of an undivided % interest in the property sought to be partitioned, and the defendant the owner of an undivided % interest, and it therefore follows that the plaintiff is entitled to % of the proceeds of the sale and the defendant entitled to % of the proceeds of the sale of the property by the Sheriff.
All costs of these proceedings up to and including the sale and costs of sheriff’s deed to the purchaser and any costs by the Clerk of Court in the distribution of the funds shall be borne by the mass and paid prior to the division of the proceeds of said sale, all costs of this suit to be paid by the defendant.
As amended the judgment of the District Court is affirmed.