I concur in the decree. I am not in accord however with the statement in the opinion to the effect that the established jurisprudence is that services rendered by a child to a parent who is not in a penurious condition are presumed to be gratuitous in the absence of an express or implied promise on the part of the parent to pay. Among the cases cited in support of the proposition is Muse v. Muse, 215 La. 238, 40 So. 2d 21, the latest on the subject. I do not agree with the holding in that case. My views on the question are fully stated in the opinion written for the Court of Appeal, First Circuit, in that same case, 33 So. 2d 128, to which I still adhere.

52 So.2d 858

### Succession of WALLACE.
### WALLACE v. BANKS.
No. 39877.

April 23, 1951.

Rehearing Denied May 29, 1951.

Ashton L. Stewart, Baton Rouge, for plaintiff-appellant.

Weber & Weber, Baton Rouge, for defendant-appellee.

FOURNET, Chief Justice.

Melton Wallace, contending that his deceased wife, Martha Williams Wallace,

died intestate leaving neither ascendents nor descendants excepting a son, Willie Banks, born of an adulterous union, and as surviving spouse that he is entitled to the ownership of her undivided half interest in the community of acquets and gains formerly existing between them, instituted proceedings to have set aside an ex parte judgment recognizing the said son as the heir of deceased and placing him in possession of her estate; and from a judgment of the district court rejecting his demands he prosecutes this appeal.

The defendant, Willie Banks, was born to Martha Williams, then a young unmarried colored girl, on April 7, 1893, near Clinton, Louisiana. The record contains no reference to a recordation of this birth. About three years later Martha Williams was married to Mike Johnson, with whom she resided for some time; however, it appears that when the defendant (who lived with his mother) was a boy of ten or eleven years, Martha Williams and the plaintiff began living together and this association apparently continued until the fall of 1919, when she divorced Mike Johnson and was married to the plaintiff. There were no children of either marriage. Martha Williams died on September 15, 1948, leaving surviving her only the defendant herein, and shortly after her death he caused himself to be placed in possession of her estate—which consisted entirely of her undivided half interest in two pieces of real property acquired during the second community. The plaintiff is seeking to have that judgment set aside and to have himself, as surviving spouse in the community, recognized as the sole heir of deceased and entitled to inherit her share of the community, alleging that Willie Banks is an adulterous bastard, the issue of a union between the deceased and one Anderson Banks, who, at the time of the child's conception and birth, was Married to Mary Jane Johnson.

On trial of the merits of the case, upon objection of counsel for the defendant to any evidence seeking to establish the identity of the father of defendant, the judge excluded evidence of general reputation and idle comment, and limited the proof of paternity of defendant to the character of evidence prescribed by Article 209, Revised Civil Code (Article 210 being admittedly unavailable to plaintiff since the mother had made no oath of the child's paternity and moreover was not free of dissolute manners), citing the Succession of Tyson, 186 La. 516, 172 So. 772, as authority for his ruling.

Article 209 of the Code provides:

"In the case where the proof of paternal descent is authorized by the preceding article [illegitimate children, not legally acknowledged], the proof may be made in either of the following ways:

"1. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so;

"2. When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such;

"3. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived."

The plaintiff, thus restricted, after having offered a certified copy of a marriage license between Anderson Banks and Mary Jane Johnson dated December 19, 1889, sought to establish the allegations of his petition through the testimony of two elderly colored men, Tom and Willie Hardy (brothers), who stated that they had known Anderson Banks all their lives and he had told them on numerous occasions that he was the father of defendant. The testimony of these witnesses was more or less the same, and was, in substance, that during their childhood they lived on the same plantation with the mother of defendant; that Anderson Banks and Mary Jane were living there at the time as husband and wife; that when defendant was born, they were about seven and nine years of age; that he (Willie Banks) was brought to their home as a baby, Tom Hardy helped take care of him, and Anderson Banks played with the child at their home, sent him a little package of clothing, made a wagon for him, and stated openly that the child was his son. However, according to these witnesses, Anderson Banks and the mother of the defendant were seen together on only one occasion (an entirely innocent trip to town), and the child never visited Anderson's home.

It appears that the deceased removed to another community with her child when he was a very small boy, and neither the witnesses nor Anderson any longer saw them. Willie Hardy testified that in later years Anderson used to visit his home in Baton Rouge and would always "ask me about his son," meaning the defendant. In 1933, shortly before Anderson's death, he sent word to Tom Hardy, the message being, according to the testimony of the witness, that Anderson "said he had seen all his children but Willie, and to tell Willie to come see him." (At this time Anderson was married to the sister of these witnesses, having previously been divorced from his first wife.)

While the trial judge was favorably impressed with these witnesses, in that he believed they were telling the truth to the best of their knowledge and information, he held, nevertheless, that a higher type of evidence than that produced was necessary in order to brand Willie Banks an adulterous bastard.

Clearly, if the defendant is an adulterous bastard, certain legal consequences result; and to resolve this question we must revert to the Articles of the Civil Code in order to determine his status. Article 920 provides that adulterous bastards shall not enjoy the right of inheriting the

estates of their natural father or mother, the law allowing them nothing more than a mere alimony; and by the provisions of Article 182, an adulterous bastard is defined as one produced by an unlawful connection between two persons who, at the time when the child was conceived, were (either of them or both) connected by marriage with some other person.

The provisions of our law, established in the interest of public morals and seeking as they do to honor matrimony and discourage illicit connections, have nevertheless had the harsh result of making the innocent offspring the victim of the guilt of the parents; and in determining the rights of these unfortunates the question of the admissibility of proof of paternity against a claimant has been the subject of difficult decision since the earliest days of the Court. While the Civil Code specifically states the type of proof admissible to prove legitimate filiation, Arts. 193 et seq., and that allowed an illegitimate child to prove paternal descent where he has not been legally acknowledged, Arts. 209 and 210, it is silent as to the type or extent of proof admissible in the case of an attack upon an individual through his paternity, so that the courts have had no exact guide in the form of positive law to assist them in adjudicating upon this question.

The subject has been further complicated by the fact that the jurisprudence of France and the law of Spain permitted the child to resist introduction of evidence

of paternity when he sought to inherit from the mother, and this was often urged e. g., Jung v. Doriocourt, 4 La. 175; Robinett v. Verdun's Vendees, 14 La. 542, and the rule was at times applied, e. g., Jobert v. Pitot, 4 La.Ann. 305; see, also, Lange v. Richoux, 6 La. 560. However, the courts of this State, during the period before and following the Civil War, being confronted with social problems unknown in those countries, generally held that French law was no gauge of the rights of litigants in our courts. Furthermore, according to the provisions of the Civil Codes of 1808 and 1825 (Articles corresponding to Article 208, R.C.C.), illegitimate children, "provided they be free and white", were allowed to prove paternal descent from a white father, and illegitimate children of color could prove descent from a colored father only—reflecting public policy. Thus, where illegitimate colored children sought to take by bequest from a white father, even though they were precluded from proving their paternity, proof of same was freely admitted to bar their claims. Jung v. Doriocourt, supra; Robinett v. Verdun's Vendees, supra; Succession of Vance, 110 La. 760, 34 So. 767.

In an early case, Badillo v. Tio, 6 La. Ann. 129, 139, this Court declared that there "is no law excluding the evidence offered [by legal heir of the deceased], or prohibiting the proof on behalf of the heir of the fact [of paternity of the claimant] to be established;" and, in a later case, Succession of Fletcher, 11 La.Ann.

59, 61, observed: "* * * and it is not to be presumed that they [offspring of an adulterous connection] will themselves disclose the fact of their infamous origin, to defeat their own pretensions." On the other hand, when an illegitimate child seeks to inherit from the mother, there being no legitimate children, proof of paternity has been restricted, Jobert v. Pitot, supra; Succession of Tyson, 186 La. 516, 172 So. 772, the court having recognized that this procedure is correct "especially when proof of the descent leads to disreputable investigations in court, aggravated by all the indelicacy which cupidity can excite." Dupre v. Caruthers, 6 La.Ann. 156, 157.

■ In Succession of Tyson, supra, the latest case before this Court involving admissible proof of paternity against an illegitimate claimant, and analogous on its facts to the proceeding here involved, certain natural children of the deceased mother sought to inherit from her to the exclusion of her other natural children on the ground that the latter were adulterous bastards. We restricted proof of paternity to the character of evidence permitted under Articles 209 and 210 of the Code (but found that the proof offered did not satisfy the requirements). We adhere to this jurisprudence and reaffirm the principle that courts should be most cautious in their adjudications under facts such as are here presented. The lawmakers having seen fit to prescribe the type of evidence admissible where a child of illegitimate birth seeks to prove his paternity,

we can think of no sound reason why the rule should be extended when the attempt is made to bar one claiming from his natural mother, through attack on his paternity—particularly since a relaxation of the rule would stigmatize the child for an act of which he was completely innocent, and adherence thereto does not jeopardize the rights of heirs claiming from the alleged father.

■ It is true that in the instant case the evidence does, at first glance, appear to comply with one of the modes of proof sanctioned by Article 209. We nevertheless agree with the conclusions of the trial judge that the evidence should be of a more convincing type than that offered here, for, on further consideration, it is clear that the statements made by Anderson Banks to boys of such immature age, more than fifty years previous to the date of trial, are to be viewed with extreme caution, especially since those boys were too young at the time to distinguish whether the remarks were made in an affectionately playful manner or with serious intent—or perhaps in the nature of braggadocio. The defendant himself testified that he had never known Anderson Banks, and this was not sought to be contradicted. Random inquiries attributed by the witnesses to Anderson Banks in later years would not of themselves be entitled to great probative value, certainly not sufficient to establish paternity, particularly since there is room to wonder why such inquiries were made at all—there being

no showing that the witnesses ever saw the defendant from the time of his babyhood, or that they knew where he lived or had any association whatsoever with him. Moreover, the testimony of these witnesses is further weakened by the fact that Tom Hardy, the younger brother, testified that Martha Williams had another son, older than the defendant, and that he used to help take care of both children for her, whereas Willie Hardy, who was older, and who went into detail about the various people who took care of defendant as a baby, including the statement that the defendant was often left in care of the witness' mother, made no mention whatever of the other child. In view of the seriousness of a determination based on such proof, it must be clear and not subject to doubtful interpretation.

For the reasons assigned, the judgment appealed from is affirmed.