419 So.2d 490 (1982)
IMC EXPLORATION COMPANY and the Petroleum Corporation of Delaware, Plaintiffs-Appellees,
v.
Foster HENDERSON, et al., Defendants-Appellants.
No. 14777.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1982.
Rehearing Denied September 24, 1982.
*492 Shotwell, Brown & Sperry by James H. Napper, II and George Wear, Jr., Monroe, for plaintiffs-appellees IMC Exploration Co. and Petroleum Corp. of Delaware and defendants-appellees William Beasley and Saralyn Beasley.
Colvin, Hunter, Brown, Plummer & Means by David B. Means, III, Mansfield, for defendants-appellants Foster Henderson, Charlie Mae Henderson White and Leatha Henderson Horn.
A. C. David, Shreveport, for defendants-appellants Geraldine Henderson Williams, Charles E. Henderson, and Emma Lee Henderson
Gene M. Griswold, Shreveport, for defendants-appellants May Petroleum, Inc., John S. Simonton and Eva Rodger Simonton.
Bodenheimer, Jones, Klotz & Simmons by David Klotz, Shreveport, for defendants-appellees *493 Franklin R. Harrington and Elouise Hinkie Harrington.
Joseph R. Bethard and S. V. Prunty, Jr., Shreveport, for defendants-appellants Cartelyons Jacobs, Mary Jacobs Hall, Martha Jacobs Williams, Fletcher Jacobs, Jr., Ollie Patricia Jacobs Wilson, Carolyn Jacobs Armstrong and Louis Jacobs Lee.
Wiener, Weiss, Madison & Howell, Shreveport, for defendants-appellees Kent Uspon and Todd Upson.
Herman L. Lawson, Mansfield, for defendant-appellee Rayvenita Thomas.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
In this concursus proceeding filed by IMC Exploration Company and The Petroleum Corporation of Delaware to determine the royalty ownership of proceeds from a bi-level well located in the North half of Section 23, Township 13 North, Range 15 West, in DeSoto Parish, two groups of claimants appeal an adverse judgment.

FACTS
IMC Exploration Company and The Petroleum Corporation of Delaware are the working interest owners of certain oil, gas and mineral leases covering the above described property. This proceeding was filed to determine who in fact are the true owners of the royalties accrued from the producing Gamble A-2 and A-2d wells located on the property whose ownership is in question.
There are three groups of rival claimants, all of whom were made party defendants. The group hereinafter referred to as the "Foster Henderson Group" is composed of the recognized legitimate descendants of Martha Carr Henderson and Charlie Henderson, the record owners of the property, as well as their mineral assignees. The group hereinafter referred to as the "Jacobs Heirs" is composed of the legitimate descendants of one Sophia Williams (Henderson) Jacobs and their mineral assignees. This group claims that their mother, Sophia Jacobs was either the legitimate daughter of Charlie and Martha Henderson who was legitimated by their subsequent marriage or the illegitimate daughter of Martha Henderson. Sophia predeceased both Martha and Charlie Henderson. Therefore, they contend that they are entitled to inherit from Charlie and/or Martha Henderson by representation. The final group of claimants is composed of Rayvenita Thomas and her mineral assignees who contend that Rayvenita Thomas is the illegitimate daughter of Moody Henderson, a son of Martha and Charlie Henderson who predeceased his parents, thus entitling Rayvenita Thomas to inherit from the Hendersons by representation.
According to the pre-trial stipulations entered into between all parties, Martha Ann Carr was married twice, first to Dee Ivy on February 2, 1892. Martha Ann Carr and Dee Ivy were divorced on January 29, 1896. Martha Ann Carr was married secondly to Charlie Henderson on January 27, 1897. Five children were born during the marriage of Martha Ann Carr and Charlie Henderson. They are as follows: Foster Henderson, Charlie Mae Henderson White, Leatha Henderson Horn, Sandy Henderson and Moody Henderson.
Bobbie Stergies was married to Waverly Markham on February 24, 1923. Rayvenita Thomas was born to Bobbie Stergies Markham on November 19, 1925. No divorce proceedings are recorded in the Eleventh Judicial District Court, DeSoto Parish, Louisiana between Bobbie Stergies Markham and Waverly Markham. Rayvenita Thomas was married to David Thomas on August 14, 1943.
Moody Henderson was married but once and then to Ethel Lee Phillips on November 6, 1928. They were divorced on June 26, 1943, without children born of the marriage. Moody Henderson died intestate on July 10, 1946.
Sandy Henderson was married but once and then to Qutee Fobbs on February 1, 1934. He died intestate on December 24, 1970, leaving as his sole heirs issue of his *494 marriage Geraldine Henderson Williams, Emma L. Henderson, Charles E. Henderson, John Paul Henderson and Rose Marie Henderson. Sandy Henderson fathered no other children.
Charlie Henderson, while married to Martha Henderson, acquired good and valid title to the property at issue in this proceeding in 1938 and 1945. Martha Ann Carr Henderson died intestate on August 6, 1964.
Although not stipulated to, the evidence shows that Charlie Henderson died intestate on January 21, 1947.
Based on the stipulations and the evidence adduced at a two day trial, the trial court found in written reasons for judgment that the "Jacobs Heirs" had failed to prove their claim by the required preponderance of the evidence; that Rayvenita Thomas was the informally acknowledged, biological daughter of Moody Henderson; and that the legal heirs of Charlie and Martha Henderson were:
a. Foster Henderson;
b. Charlie Mae Henderson White;
c. Leatha Henderson Horn;
d. Rayvenita Henderson Thomas, inheriting by representation from her deceased father, Moody Henderson;[1]
e. Geraldine Henderson Williams; Emma L. Henderson; Charles E. Henderson; John Paul Henderson; and Rose Marie Henderson, inheriting, equally by representation from their deceased father, Sandy Henderson.
For the purposes of reference, a diagram of the "Henderson Family Tree" prepared by counsel for Foster Henderson, et al is attached hereto as Exhibit "A".
The "Jacobs Heirs"[2] appeal contending that the trial court erred (1) in not recognizing Sophia to be the legitimate child of Charlie and Martha Henderson, or alternatively, the illegitimate child of Martha, and thus not entitling them to represent her in the unopened Successions of Charlie and/or Martha Henderson; and (2) in recognizing the claim of Rayvenita Henderson.
The "Foster Henderson Group"[3] appeals that part of the judgment recognizing Rayvenita Thomas as a legal heir of Moody Henderson, thus entitling her to inherit from Charlie and Martha Henderson by representation of her biological father, and assign the following errors:
A. The trial court erred in overruling Appellants' Peremptory Exception of Prescription finding that one co-owner cannot prescribe against another co-owner.
B. The trial court erred in overruling Appellants' Peremptory Exception of No Right or Cause of Action in finding that Appellee was not the legitimate daughter of Waverly Markham, the husband of her mother at the time she was conceived and born, and entitled to inherit only from him.
C. The trial court erred in overruling Appellants' Peremptory Exception of No Right or Cause of Action in finding that Appellee could be elevated to the status of a natural child despite the fact her mother and father were incapable of contracting marriage at the time of conception.

*495 D. The trial court erred in overruling Appellants' Peremptory Exception of No Cause or Right of Action, finding that Appellee was entitled to inherit from her purported father, Moody Henderson, despite the fact that she was an acknowledged illegitimate child who would have had no right to inherit under the law applicable on the date of his death.[4]
E. The trial court erred in finding that Appellee was duly acknowledged by her purported father, Moody Henderson, and that the community accepted that she was his child.

CLAIM OF THE "JACOBS HEIRS"
Any claim of the "Jacobs Heirs" to a proportionate share of the proceeds of the fund made the subject of this litigation is conditioned upon their proving that Sophia Williams (Henderson) Jacobs was the predeceased legitimate/legitimated daughter of Charlie and/or Martha Henderson or the predeceased illegitimate daughter of either Charlie or Martha Henderson. After hearing all of the evidence, the trial court concluded that they had failed to carry their burden of proof in this regard by a preponderance of the evidence.
We have reviewed this record in great detail and conclude that the trial court's ruling in this regard was not manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Briefly stated, the evidence does not establish the date nor the circumstances of Sophia's birth. Likewise, the evidence does not preponderate that Sophia was the biological child of either Martha or Charlie Henderson. Admittedly, it is clear that they brought her to their home from the "Jacobs' Place" at some time prior to 1900 where she lived until her marriage to Fletcher Jacobs in 1911. To say the least, the evidence is certainly conflicting as to whether or not either of them ever informally acknowledged her as their child. According to the evidence adduced, it is possible that Sophia was the biological daughter of Martha by her previous husband, Dee Ivy, or by Charlie Henderson prior to their marriage. It is equally possible that she was the biological daughter of Martha by some unnamed father. Conversely, it is equally possible that she was not the biological child of Martha or of Charlie but was a child whom they brought into their home and raised gratuitously until she married. She was known as Sophia Williams as well as Sophia Henderson. On her marriage license, she is referred to as Sophia Williams, and that document bears her signature as Sophia Williams.
The record is devoid of evidence that Charlie or Martha Henderson ever formally acknowledged, legitimated, or adopted her. At best, the evidence regarding Sophia deals within the realm of possibilities; obviously, this is an insufficient basis from which to determine that she has proved her claim by a preponderance of the evidence. "Preponderance of the evidence" clearly means "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." Braud v. Kinchen, 310 So.2d 657 (La. App. 1st Cir. 1975). Here proof that something is possible is of little probative value as to an ultimate issue of fact unless it is established with reasonable certainty that all other alternatives are impossible. Lutheran Church of the Good Shepherd of *496 Baton Rouge v. Canfield, 233 So.2d 331 (La.App. 1st Cir. 1970).
Our review of the record causes us to agree with the trial judge's finding in this regard. We also conclude that the "Jacobs Heirs" failed to prove their claim by a preponderance of the evidence.

CLAIM OF RAYVENITA THOMAS
A more serious problem is presented in regard to the claim of Rayvenita Thomas and her mineral assignees. Because appellate courts in civil cases have full and complete jurisdiction to review the facts in cases appealed [La. Constitution of 1974, Article 5 § 10(B); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978)], it is necessary that we review the complete record to determine whether or not the finding of the trial court is clearly wrong or manifestly erroneous.
As stated in Arceneaux v. Domingue, supra, by the Louisiana Supreme Court:
... It was never our intention to hold that a factual determination of the district court is to be sustained by the Court of Appeal if there is some reasonable evidence to support the finding of the judge or jury. * * * In Louisiana courts of appeal have full and complete jurisdiction to review facts.
* * * * * *
... the appellate court should not disturb such a finding of fact unless it is clearly wrong. Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong (manifestly erroneous).
After this explanation, the court went on to state:
If the Court of Appeal had applied the proper standard for review of facts on appeal, it would have concluded that, in spite of the presence of some evidence in the record which, if believed, would have supported the jury verdict, the verdict was clearly wrong (manifestly erroneous). (Footnote omitted.)
In an attempt to review this record in accord with the mandate of the Supreme Court, it is necessary that we discuss at length the factual basis for the trial court's findings and the law applicable thereto.
Under the present state of the jurisprudence, we conclude that there existed at time of trial no legal bar or impediment which precludes this claimant from attempting to prove that her biological father is someone other than her presumed legal father, Waverly Markham. If she has proven by a preponderance of the evidence that her biological father is in fact Moody Henderson then under Succession of Brown, 388 So.2d 1151 (La.1980) and Succession of Clivens, ___ So.2d ___ (La.1982), she is entitled to her proportionate share of the Successions of Martha and Charlie Henderson by virtue of her representation of her father provided this right has not prescribed, an issue which was raised but which we pretermit in view of our holding hereinafter expressed. See also Babineaux v. Pernie Bailey Drilling Co., 261 La. 1080, 262 So.2d 328 (1972); Warren v. Richard, 296 So.2d 813 (La.1974); Succession of Mitchell, 323 So.2d 451 (La.1975); In Re Poche, 368 So.2d 175 (La.App. 4th Cir. 1979), writ refused 370 So.2d 577 (La.1979).
By virtue of the stipulations entered into in the instant case and the lack of evidence regarding a divorce between Bobbie and Waverly Markham or an action en desavu filed by Waverly Markham or his heirs, Rayvenita Thomas is presumed to be the legitimate child of Waverly Markham. [See La. C.C. Art. 184 as it read when Rayvenita was born and as amended by Act. No. 430 of 1976.[5]] The presumption *497 contained within Article 184 at one time was referred to in our jurisprudence as the strongest presumption recognized in the law. Williams v. Williams, 230 La. 1, 87 So.2d 707 (1956); Feazel v. Feazel, 222 La. 113, 62 So.2d 119 (1952). Formerly, if the husband of the mother of the child or his heirs under certain circumstances did not file an action to timely disavow then the issue of paternity was closed and could not be attacked by third parties, including the wife or the child in question. George v. Bertrand, 217 So.2d 47 (La.App. 3d Cir. 1969); cert. denied 253 La. 647, 219 So.2d 177 (1969); Succession of Barlow, 197 So.2d 682 (La.App. 4th Cir. 1967), cert. denied 250 La. 917, 199 So.2d 921 (1967); Succession of Saloy, 44 La. 433, 10 So. 872 (1892). However, in Warren v. Richard, supra, and Succession of Mitchell, supra, this presumption was found not to be unrebuttable to the child and/or children affected thereby entitling a relationship to be established between biological fathers and their illegitimate children. It is noteworthy that in these two cases that there was no question but that the presumed fathers were not the biological fathers of the children.
Accordingly, we have reviewed the evidence in the instant case to determine if Rayvenita Thomas has proven by a preponderance of the evidence that she is not the legitimate child of Waverly Markham but is in fact the biological daughter of Moody Henderson. This right of action would not have been available to her prior to Warren and Mitchell. Furthermore, in the instant case the issue of whether or not Moody Henderson was her biological father was vigorously contested whereas in the cases cited, there was obviously no dispute as to the identity of the biological fathers.
It is conceded that Rayvenita Thomas was not formally acknowledged by Moody Henderson in accordance with La.C. C.Art. 203.[6] We further conclude that after the decision in Succession of Clivens, supra, it is of no moment as to whether Rayvenita Thomas was an acknowledged or an unacknowledged illegitimate.
*498 However, the following articles of the Louisiana Civil Code in effect at the time of the trial of the instant lawsuit are pertinent and read as follows:[7]
Art. 208
Illegitimate children, who have not been acknowledged as provided in Article 203, may be allowed to prove their paternal descent.
Art. 209
In the case where the proof of paternal descent is authorized by the preceding article, the proof may be made in either of the following ways:
1. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so;
2. When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such;
3. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived.

*499 Art. 210
The oath of the mother, supported by proof of the cohabitation of the reputed father with her, out of his house, is not sufficient to establish natural paternal descent, if the mother be known as a woman of dissolute manners, or as having had an unlawful connection with one or more men (other than the man whom she declares to be the father of the child) either before or since the birth of the child.
Without explicitly so stating but obvious from its finding, the trial court applied La. C.C. Art. 209 and found that Rayvenita Thomas had proved by a preponderance of the evidence that Moody Henderson was her biological father. Thus, she was allowed to retain the legitimate status and also to achieve an illegitimate status. The pertinent portion of the trial court's ruling reads as follows:
Bobbie Stergis (Sturgis) married Waverly Markham on February 24, 1923.
They separated some months later, the exact date not being established, and Waverly Markham apparently left the State of Louisiana, never to return. There is no evidence that they were ever divorced.
Markham had been gone a year or so (Tr. 222) when Bobbie Stergis Markham gave birth to a girl child which she named Rayvenita Henderson. Moody Henderson repeatedly acknowledged that this was his child. Tr. 219, 207. There is testimony that "she is just like her Daddy", Tr. 226, and that the community accepted as a fact that Rayvenita was the child of Moody Henderson. That Moody Henderson actually lived with Bobbie, off and on, during this period of time is well established. It is to be noted that Bobbie's name is sometimes spelled Bobbie Stergies Markham, and sometimes Bobbie Sturgis Markham.
However, our review of the record indicates that in concluding that Waverly and Bobbie Markham separated some months after their marriage (the exact date not being established) after which Waverly apparently left the state never to return, the trial court evidently overlooked the testimony of Rayvenita Thomas on this point. While being questioned by counsel for her mineral assignees, she testified as follows:
Q. Do you know when Waverly Markham left here?
A. No, I don't.
Q. Do you remember when he came back?
A. No, I don't.
Q. Do you remember him coming back?
A. No, I don't. All I know is he went to California and that is where he died at is all I know.
However, under cross examination by counsel for the "Foster Henderson Group" she stated:
Q. Now, you testified that you knew Waverly Markham, describe for the Court your relationship with Waverly Markham?
A. No more than he came by my house and talked and dig bait and go fishing.
Q. Over what period of time did all of this occur?
A. That has been about really now twenty-three years.
Q. He did this over a period of twenty-three years?
A. No, it was before twenty-three years?
Q. Alright, you were born in 1925?
A. Right.
Q. What period of time did you know Waverly Markham?
A. Until I was growed up, I don't know how old I was.
Q. When was the last time you saw Waverly Markham?
A. Oh, it has been years.
Q. How old of a girl were you when you saw him last?
A. I couldn't tell you, but I was grown.
Q. You were a grown girl the last time you saw him?
A. Right.
Q. He was alive at the time that you were a grown girl?

*500 A. Right.
Q. You testified to an incident of Moody Henderson coming to your house and saying he wanted to take you with him, how old were you then?
A. I was around about six.
Q. When was the next time after that that Moody Henderson came to your house?
A. I didn't say he came to my house any more.
Q. Alright, did he ever come to your house again?
A. No, Sandy did.
Q. So Moody never came to your house again after you was six years old?
A. If he did I don't remember it.
Q. And any of those gifts you were not sure whether Moody brought them or Waverly Markham or anybody, is that right?
A. That's right.
To say the least, Rayvenita's testimony is conflicting or confusing on this point. According to her, Waverly Markham either left once and came back and left again or he never left until she was grown. At any rate, her testimony indicates that the finding of the trial judge in this regard was erroneous.
While acknowledging correctly that the exact date of Waverly's departure prior to Rayvenita's birth was not proven, the trial court nevertheless concluded that Waverly had been gone at least a year prior to Rayvenita's birth. Attempting to recall events which obviously took place some fifty-five years prior to his testimony, M. T. Wilson testified on this point as follows:
Q. Let me ask you, Mr. Wilson, you remember Waverly Markham, don't you?
A. Yeah, I knowed him.
Q. Do you remember when he was with Bobbie Stergis?
A. Yeah, Bobbie stayed down at the place he was at.
Q. Do you remember Waverly was with Bobbie?
A. Yes sir.
Q. And then you remember Waverly left?
A. Yes sir.
Q. And you remember Waverly leaving, don't you, leaving Bobbie?
A. Leaving Bobbie.
Q. That was before Rayvenita was born, wasn't it?
A. That's right.
Q. It was a long time before Rayvenita was born that Waverly left, wasn't it?
A. Yeah, it was a pretty good while, about a year ago.
Q. A year ago?
A. Yes sir.
Q. So Waverly wasn't around then when Rayvenita was born?
A. No, he had done left.
Conversely, upon cross-examination, this same witness indicated that Waverly Markham was still in the picture when Rayvenita was conceived. This pertinent testimony is as follows:
Q. Now, you talked about Moody for a while and said that Moody was kind of slipping in and out with Bobbie, is that what you said?
A. Yes sir, bootlegging.
Q. Well, this was in response to a question that Mr. Lawson asked you about Moody going with Bobbie, now who is he slipping in and out between when he was going with Bobbie, was that Waverly?
A. I reckon it was; it was another one I know.
Q. How many men did Bobbie have?
A. Oh, Lord, hitting here and yonder.
Q. Hitting here and yonder?
A. Yeah.
Q. Moody was just one of them, wasn't he?
A. Yeah.
Q. Do you reckon he spent all that bootleg money supporting the child?

*501 A. No, he didn't because he would gamble some and all of that.
Q. Did he really tell you he spent any of that bootlegging money supporting a child?
A. Well, I know that he did.
Q. What child was he talking about?
A. Rayvenita.
Q. How do you know?
A. Well, he would slip there and stay some nights and things.
Q. There were more people slipping in and out of there besides Moody is what you say, wasn't it?
A. Yeah, but she is just like her daddy.
Q. Name some of the other people that were slipping in and out?
A. Uncle Levi Mosely's boys.
Q. What were their names?
A. I don't know, I done forgot all their names, because they was big boys older than me.
Q. So you just knew what they were doing?
A. Yes, sir.
It is noteworthy that Foster Henderson testified that Moody Henderson was in south Texas from July, 1919, until March, 1925. Although Mr. Wilson's testimony is admittedly vague, it appears that he was referring to March, 1925, when Moody was "slipping in and out" seeing Bobbie because Rayvenita was born November 19, 1925. However, his testimony clearly indicates that not only was Moody Henderson on the scene at that time but also Waverly may have been living with his wife. Additionally, Uncle Levi Mosely's boys and others unknown may have been involved with Bobbie according to the statement that she was "hitting here and yonder."
Furthermore, Mr. Wilson's testimony taken as a whole indicates that he may well have been confused about the time frame or sequence of events. He stated that he had forgotten the names of those who were seeing Bobbie because "they was big boys older than me." He earlier testified that his date of birth was February 1, 1893. If this is correct, then he would have been thirty-two years old at the time in question, March, 1925.
Mr. Wilson's vague testimony is certainly understandable, and the reasoning expressed in Succession of Marcour, 180 La. 129, 156 So. 198 (1934) is equally applicable here:
... But nothing tends to obscure the memory so much as the lapse of time. And this is particularly true where the facts testified about occurred in the childhood or early youth of a witness and were devoid of any interest for him. Such testimony is unsafe to act upon except so far as it is borne out by what is natural and probable under the circumstances taken in connection with the known facts.
Taken as a whole, Mr. Wilson's testimony can only lead to the conclusion that Moody, Waverly, one of Uncle Levi Mosely's boys, or someone unknown could have been the biological father of Rayvenita. In light of his other testimony concerning Bobbie's "activities," his testimony that she "is just like her daddy" without further amplification certainly has little if any probative value. See 10 C.J.S. Bills and Notes § 92. At best, his testimony is of doubtful reliability.[8]
The other witness who testified as to when Waverly left prior to Rayvenita's birth was Mrs. Nomie Lee Black. However, *502 under cross-examination it was obvious that she could not recall when he left, finally admitting "I just really have forgotten them days."
Clearly, the trial court's finding that Waverly Markham had been permanently gone a year prior to Rayvenita's birth is not supported by the evidence.
Additionally, the trial court found that "Moody Henderson actually lived with Bobbie Stergies Markham, off and on, during this period of time." It is significant to note that none of the witnesses who testified on behalf of any of the parties to this proceeding ever testified that Moody Henderson and Bobbie Stergies Markham lived together as husband and wife or in open concubinage. It is of further note that in answer to interrogatories propounded to Rayvenita Thomas and offered into evidence, she answered "no" to the question, "Did your mother Bobbie Stergies, ever live in open concumbinage (sic) with Moody Henderson?" Therefore, we can only conclude that this finding of fact is unsupported by the evidence.
The trial court concluded that "Moody Henderson had repeatedly acknowledged that this was his child." Of eighteen witnesses who testified, the only two witnesses to testify that Moody Henderson publicly or privately acknowledged Rayvenita as his daughter were M. T. Wilson and his wife, Genevie Wilson. It is apparent that the trial court relied solely on their testimony in arriving at this conclusion.
The evidence reveals that if these "acknowledgments" in fact occurred, the "acknowledgment" to M. T. Wilson consisted of a statement that Moody told Wilson he was bootlegging to get money to help buy something for his "baby," and Mr. Wilson understood the baby to be Rayvenita. Taking this isolated statement in connection with the entire testimony of this particular witness as discussed prior, such an "acknowledgment" is entitled to little if any weight and is certainly suspect.
Additional problems are presented in the testimony of Genevie Wilson regarding Moody's "acknowledgment" of Rayvenita as his child to her. At most, her testimony is to the effect that on one occasion when no one was present but Moody and the witness, he told her that Rayvenita was his child. While being questioned by Rayvenita's counsel, Mrs. Wilson testified as follows:
Q. Did you ever speak with Moody Henderson concerning Rayvenita Thomas?
A. Shore did.
Q. How many occasions did you speak with him concerning her?
A. Oh, lots of times.
Q. Did he know you and your husband?
A. Oh, I reckon he did.
Q. What is your husband's name?
A. M. T. Wilson.
Q. Would he ever drop by ya'll's house?
A. Sure did.
Q. How many times, was it often, or seldom?
A. Several times.
Q. Did he ever tell you anything about Rayvenita Henderson Thomas?
A. Well, he say Ray was his daughter
...
Q. When you say "Ray" who are you speaking of?
A. Rayvenita. We just call her Ray for a short name. He called her Ray too.
THE COURT: Who is he?
THE WITNESS: Moody Henderson.
Q. On how many occasions would he say that was his daughter?
A. I don't know how many occasions.
Q. Was it more than once?
A. Shore was.
Q. More than that, could you be more specific or not?
A. That's right.
Q. I always hate to ask a woman how old she is, but after a certain point I think it is a compliment, how old are you?
A. 50.
However, on cross-examination by counsel for the "Foster Henderson Group" she states:
Q. Mrs. Wilson, you stated you were 50 years old, do you know what year you were born in?

*503 A. Yeah, I was born on December 20, 1919 or
Q. December 20, 1919?
A. Yes or either 1910 one, you know somewhere along in there; I ain't got it down but it is in the bible.
* * * * * *
Q. You say that you knew Moody Henderson?
A. I do.
Q. Did Moody go by Bobbie Sturgis' house a good bit?
A. I don't know that. I wasn'tyou know, he was staying in one place and we was staying in another, I didn't know.
Q. Did he go by and see Rayvenita a good bit?
A. I don't know, we wasn't staying that close together.
Q. You didn't have that much connection with you and Moody or with you and Rayvenita?
A. With Moody.
Q. You weren't that close with Moody?
A. I was close to Moody alright, I was double first cousins to him.
Q. I am not talking about family relations, I am talking good friendship, you weren't close friends with Moody?
A. No, not with that.
Q. Did ya'll ever talk any?
A. Oh, precious little bit.
Q. Precious little bit?
A. Yeah.
* * * * * *
Q. Ya'll didn't ever talk about who was Rayvenita's father?
A. No, no more than what he told me once that Ray was his daughter and that's all.
Q. He told you one time?
A. Yes, shore did, one time.
Q. Now, you testified before on a great many occasions he told you that?
A. Well, he did, you know, came along, but not a whole lot of times.
Upon cross-examination by counsel for Rayvenita Thomas' mineral assignees, Mrs. Wilson went on to state:
Q. Now Moody told you at least once that Rayvenita was his daughter?
A. Yes sir.
Q. You are sure of that, aren't you?
A. Yes sir.
Q. Were you ever around when Moody told anybody else that Rayvenita was his daughter?
A. No, no.
In connection with this witness' testimony (as well as the testimony of most of the witnesses who testified in this case) there is a problem with the time frame within which these events supposedly occurred. We note from our review of this record that if Mrs. Wilson was in fact fifty years old at the time of trial it is incredible that she would be married and talking with Moody Henderson at any time near the date of Rayvenita's birth since Mrs. Wilson would not have been born until sometime in 1930. However, if she was born in 1910, then she would have been approximately fifteen years old when Rayvenita was born and conceivably could have been married and talked with Moody about Rayvenita. On the other hand, if she was born in 1919, she would have only been six years old in 1925 and it is unlikely that he would have been discussing such a subject with a child around that age. It is even more unlikely had he discussed this with her only on one occasion that she would have remembered it.
To say the least, her testimony is conflicting, confusing and vague. It certainly does not suffice to conclude that Moody Henderson repeatedly acknowledged Rayvenita as his child. Additionally, the record is devoid of any evidence of private writings in which Moody Henderson acknowledged Rayvenita as his daughter. There is a further lack of evidence that Moody Henderson and Bobbie Stergies lived together in open concubinage; that Moody Henderson openly supported this child or caused her to be educated *504 as his child; or that she ever resided in his home as his child. If anything, the record reveals that Rayvenita had very little contact with him and in fact had much more contact with her presumed legal father, Waverly Markham.
Therefore, we conclude that the record will not support a finding that Moody Henderson repeatedly acknowledged Rayvenita Thomas as his child, and the trial court's ruling in this regard is clearly erroneous.
Thus, the issue becomes whether or not there is sufficient evidence under La. C.C. Art. 209(2) to prove that Rayvenita was in fact the biological daughter of Moody Henderson.
To say that the total testimony presented in this case is conflicting is an understatement. The witnesses for the "Foster Henderson Group"[9] testified that Moody did not acknowledge Rayvenita as his daughter and that she was not known as such in the Grand Cane Community. Admittedly, the Henderson heirs had an interest in the outcome of the litigation as did Rayvenita, her daughters and her mineral assigneeUpson. Moody's close friend, L. E. Jackson, testified that he had lived in the community continuously for sixty-two years, knew him well, saw him frequently, and had never been told or heard that Rayvenita was his daughter.
The witnesses testifying for the "Jacobs Heirs" all testified that Moody Henderson never acknowledged Rayvenita as his daughter. However, Mary Hall, Sophia Jacobs' daughter who was born in 1916 and left Grand Cane in 1918, testified that she thought Rayvenita was Moody's daughter because of "what people said." The people allegedly making these statements were not identified, and this comment was not amplified.
Joann C. Graham, born in Grand Cane in 1923, left the community in 1939 and resided in Shreveport at the time of trial. She testified that "people said" that Rayvenita's father was one of Charlie Henderson's boys but she did not know which one. Again, the people making these statements were not identified.
Nomie Lee Black, a seventy-four year old resident of Grand Cane, testified she knew Rayvenita and that she knew who her father was. However, it is noteworthy here that she could not remember his name until Rayvenita's attorney asked her if it was Moody Henderson to which she replied "yes". It is equally noteworthy that she heard this from Rayvenita's mother alone and that her testimony was confusing and vague as to details regarding the events of the past.
Rayvenita Thomas testified that she was born in the Grand Cane community on November 19, 1925, and still resided in the area at the time of trial. She had no knowledge of whether or not her mother and Waverly Markham were living together at the time of her birth. She has no birth certificate. She considered Moody Henderson to be her father because her mother told her he was. Admittedly, Moody never told her that he was her father, and she never heard him refer to her as his daughter to anyone. She further testified that his family always treated her as a member of the family until she wrote a letter to Sandy Henderson about a timber sale telling him that they could have given her something. This testimony about her treatment as a family member was denied by the "Foster Henderson Group." After this letter, she testified the Hendersons had nothing to do with her. She recalled when Moody died but did not attend his funeral.[10] The only real contact which she testified she had with Moody was in connection with an event which she recalled occurred when she was six years old when Moody attempted to take her home with him after which her mother dissuaded him. We note if her recollection of this event is correct that Moody was at the time married to Ethel *505 Phillips. After this event, to her recollection, he never came by her house again. When she applied for her marriage license, the name listed on the application under father was "Boat Henderson," however, she testified that she gave the name of Moody Henderson. A copy of the application was filed into evidence, but no evidence was adduced to identify who this party was. She could not testify that he had ever given her gifts, and in conclusion stated that the only reason she considered Moody Henderson to be her father was because her mother had told her this.
Rayvenita's two daughters testified that they never knew Moody Henderson but that they had been told by their grandmother, Bobbie Markham, that Moody Henderson was their mother's father. One of the daughters did testify that she had heard in the community that Moody Henderson was considered to be her mother's father; however, no specific persons in the community were referred to. Also, no time frame was provided.
Kenneth Upson, a graduate attorney and oil man from Shreveport who was the mineral assignee of Rayvenita Thomas, testified that in his many conversations with residents of the Grand Cane Community he had been told that Rayvenita was well known as Moody's daughter. He failed to disclose whom the conversations were with and whether or not these persons were dead or unavailable for trial. When Upson could not secure a lease on the property in question from the Hendersons, he took a "protective lease" from Rayvenita. Admittedly, he obtained none of his information from Moody Henderson, and the sources of his information were not disclosed. We note that if the sources of his information were alive at the time of trial they should have been called to testify rather than allowing his "double hearsay" testimony.
Admittedly, hearsay evidence is admissible in certain instances to prove family history or descent. However, because this type of testimony is so easily contrived or fabricated, certain limitations are imposed to assure some degree of reliability and trustworthiness. The reason for its admissibility as an exception to the hearsay rule is the necessity of the occasion. In Succession of Anderson, 176 La. 66, 145 So. 270 (1952) the court stated:
Pedigree is the history of family descent, which is transmitted from one generation to another by both oral and written declarations and by tradition. Unless proved by hearsay evidence, not competent in general issues, it cannot in most instances be proved at all. * * *
That pedigree may be proved by hearsay testimony is settled. Such testimony is admitted because of the great difficulty, often impossibility, or proving the fact or degree of kinship between alleged relatives because the subject of inquiry is so frequently of ancient date. Respecting what facts come within the meaning of the word pedigree, and by whom the declarations reproduced as hearsay must have been made, there was some divergence of opinion in the earlier cases. But it seems to be settled now that a declaration, to be admissible, must not only have been by a person since deceased, but must also have been made by a person related by blood or affinity with some branch of the family the pedigree of which is in question. (Citations omitted.)
The circumstantial guaranty for trustworthiness, relative to declarations concerning pedigree, as said by Prof. Wigmore, is found "in the probability that the `natural effusion' (to use Lord Eldon's often quoted phrase) of those who talk over family affairs when no special reason for bias or passion exists are fairly trustworthy, and should be given weight by judges and juries as they are in the ordinary affairs of life." Their admissibility is, however, dependent also upon whether the statements were made before a controversy arose `regarding the descent.' However, `the existence of a controversy is only one circumstance (though the most common one) likely to produce a bias fatal to the trustworthiness of the declaration. Judicial opinion seems to hold, and properly, that other *506 considerations may under certain circumstances operate to exclude the declarations. In general, they would be excluded where there is any specific and adequate reason to suppose the existence of a motive inconsistent with a fair degree of sincerity. In Lord Eldon's words, they must appear to be the natural effusions, of a party standing in an even position.' (Citations omitted.) [Emphasis added.]
See also Dazio v. Wainwright, 81 So.2d 96 (La.App.2d Cir. 1955).
We would concede that pedigree or family history hearsay testimony could also include declarations from deceased or unavailable close family friends who were in a position to know and evaluate the situation.
With regard to Upson's testimony, which was objected to, there is no evidence that he is a family member or friend. Furthermore, no foundation was laid to show that the declarations made to him were by family members or close family friends now deceased or that the statements made to him were made before a controversy arose regarding Rayvenita's paternity. His testimony can only be construed to be testimony as to his interpretation of what unidentified sources told him. Certainly, this is clearly beyond any allowable hearsay exception even as to pedigree and at best amounts to "double hearsay." If his conversations were between the years of 1971 and 1978, then it is certainly conceivable that the declarants were still alive at time of trial. If so, they should have been called to testify as to their knowledge so that they would be subject to cross-examination. It cannot be denied that Upson had an interest in the outcome of the proceeding thus giving him a motive for testifying. Testimony such as Upson's is clearly the sort of testimony that is sought to be protected against by the application of the aforediscussed rules. Thus, the trial court was in error in overruling the objection to this testimony, and it should not have been admitted.
Moreover, our review of the entire record reveals that the great majority of the testimony styled "reputation in the community" lacks the foundation which is necessarily required for its admissibility. The declarants were unidentified except for Bobbie Markham and a vague reference to "Uncle Clifton" (who was never identified further) by Genevie Wilson. Other references were simply to "people in the community said" or "people say" and were in the form of answers given to leading questions. All of this hearsay evidence was timely objected to.
Pete Green, a seventy-seven year old life-long resident of the Grand Cane community, testified he knew Bobbie Markham and Rayvenita Thomas. He also believed he knew Waverly Markham. He admitted he did not know Moody Henderson well. His testimony was that he had known Rayvenita as Rayvenita Henderson since she was a baby and that Bobbie told him Moody Henderson was Rayvenita's father stating that "all I can do is take her word for it." He did not clearly testify that it was general knowledge or accepted in the community that Moody was Rayvenita's father. All other evidence regarding the reputation of Rayvenita as the daughter of Moody has been discussed previously in this opinion.
We have concluded from our review that the alleged reputation evidence with regard to who the community "accepted Rayvenita's father to be" was not in fact genuine reputation evidence of family pedigree or history admissible as an exception to the hearsay rule. Rather, we view the evidence as inadmissible "rumor testimony." In cases of this nature, reputation, i.e., the status resulting from the notoriety produced by a cumulation of the facts tending to prove the quality that a person enjoys in a family and in society, must be distinguished from rumor, which is loose talk which the community has not had an opportunity to evaluate and accept or reject. Mere uncorroborated rumor is not competent evidence. Rumor is as much inferior in probative quality to hearsay as reputation is above it; consequently, as a rule, rumor is not relevant evidence to prove a particular fact, nor is testimony as to remarks and stories of neighbors, constituting generalized hearsay *507 gossip. See Jones on Evidence, § 11.1 (6th Ed. 1972). 31A C.J.S. Rumors § 198.
By its express terms, Article 209 at the time of trial did not include general reputation as a method by which paternity may be proved. In Succession of Wallace, 219 La. 297, 52 So.2d 858 (1951), the court stated that proof of paternity must be restricted to the character of evidence permitted under Articles 209 and 210 of the Civil Code. The court in Wallace further found repeated acknowledgments by the purported father to young boys that the child was his, made more than fifty years prior to date of trial, were to be viewed with extreme caution and were insufficient to determine paternity stating "[I]n view of the seriousness of a determination based on such proof, it must be clear and not subject to doubtful interpretation." (Emphasis supplied.) Further careful scrutiny of the record reveals the reputation or rumor-type testimony in this case to be of an extremely weak nature. The sources, time frame and observations on which it is based are for the most part not contained in the record to lay a foundation for the testimony. Obviously, most of this evidence came from the declarations of Bobbie Stergies Markham. In connection therewith, the testimony of M. T. Wilson, if believed, indicates that because of her "activities" around the time of conception her declarations are suspect and entitled to little weight. La. C.C. Art. 210. His testimony indicates that she was a woman of dissolute manners, and her testimony would have been accorded little weight if she had been alive to testify at trial. Therefore, it would be erroneous to accord her hearsay declarations sufficient weight to establish paternity in this case. Certainly, if her declarations were made at a time not suspect as to motive, her declarations would be admissible as those of a deceased person against interest since they would brand her as an adultress and her child as an illegitimate. It has been held that such statements are of the weakest nature of evidence scarcely worthy of consideration. In Succession of Rockwood, 231 La. 521, 91 So.2d 779 (1956), the Supreme Court commented on such evidence as follows:
Additionally, the testimony of Geneva Derbigney and Pearl Page given in opposition to plaintiff's claim consists primarily of statements assertedly made to them by Sarah Bryanta party deceased. As we have said on numerous occasions, testimony of that nature is the weakest sort of evidence. [Citations omitted.] * * * (... "And even in cases where the hearsay is receivable as declarations or admissions against interest by the deceased person, it is viewed as the weakest evidence, scarcely worthy of consideration.")
See also, Succession of Reed, 393 So.2d 794 (La.App. 2d Cir. 1981), where we held that alleged statements of a deceased mother that a child was not hers but that of another woman to be the weakest sort of evidence and scarcely worthy of consideration. We further conclude that a mother's belief that a certain man is the child's father where there is evidence of her having sexual relations with other men at the time of conception is not sufficient to prove the paternity of the man she believes to be the father. See State, Etc. v. Guillory, 407 So.2d 1327 (La.App. 3d Cir. 1981).
In Williams v. Vidrine, 330 So.2d 396 (La.App. 3d Cir. 1976), plaintiff, the mother of a minor child, brought suit to have the defendant adjudged the father of the child. In support of her allegations, plaintiff relied on the testimony of her mother and that of a close friend to the effect that defendant acknowledged the child as his own in conversations. Additionally, defendant admitted to having told plaintiff on several occasions that the minor was in fact his child but testified he did so only to satisfy plaintiff and to induce her to continue their clandestine and illicit relationship. The appellate court in affirming the trial court's ruling that the evidence did not prove the paternity of the defendant quoted with approval the trial court's reasoning that:
Proof in such cases should be such that paternity should not be based on conjecture, *508 but rather that verbal acknowledgments in public or in private, or in conversations, are sufficiently frequent that there can be little doubt that the alleged father truly believes himself to be the father of the child. (Emphasis added.)
In Succession of Matte, 346 So.2d 1345 (La.App. 3d Cir. 1977), the Third Circuit again considered the sufficiency of proof of paternity under Article 209(2) stating:
A review of the jurisprudence interpreting this article, in both informal acknowledgment cases and in cases involving claims by illegitimate children for alimony from their fathers, reveals that the courts have generally been reluctant to find an acknowledgment (or proof of paternity) unless the father continuously and unequivically recognizes the child as his own. In several cases where the court found an informal acknowledgment or sufficient proof of paternity, the court stressed the importance of (1) continuous acknowledgment, or (2) "habitual acknowledgment," and (3) proof that the alleged father was generally reputed to be the father of the child. See respectively Succession of Corsey, [171 La. 663, 131 So. 841], supra; Gibney v. Fitzsimmons, 5 La.Ann. 250 (1850), and Succession of Vance, 110 La. 760, 34 So. 767 (1903). In a note entitled Family Law Illegitimate ChildrenProof of Paternity, 15 La.Law Review 218 (1954), the author lists from the jurisprudence the following acts which do not constitute admissions of paternity under Civil Code Article 209:
Referring to the child as his son more than 50 years before the trial in the presence of witnesses who were then young boys unable to tell whether the remarks were made "in an affectionately playful manner or with serious intentor perhaps in the nature of braggadocio," [Succession of Wallace, 219 La. 297, 52 So.2d 858]: and calling the children his own when no one was present but the children. [Badillo v. Tio, 6 La.Ann. 129 (1951)]. In the latter case the court in a dictum implied that only oral admissions of paternity made in habitual conversations with others (id. at 131) could be used to prove paternity under Article 209."
Perhaps the most recent judicial interpretation of sufficiency of evidence under Article 209 came in our decision in Williams v. Vidrine, 330 So.2d 396 (La.App. 3d Cir. 1976). There, we quoted with approval the following guidelines from the written reasons of the trial judge:
Proof in such cases should be such that paternity should not be based on conjecture but rather that verbal acknowledgments in public or private, or in conversations, are sufficiently frequent that there can be little doubt that the alleged father truly believes himself to be the father of the child.
Based on the above jurisprudence we conclude that in order for private acknowledgements in conversation to be sufficient to prove paternity these informal acknowledgments must be of a continuous, habitual and unequivocal nature; that is, of a sufficient frequency that there can be little doubt that the alleged father truly believes himself to be the father of the child. Such is not the quality of the proof in the instant case.
We further hold that absent at least one of the following:
(1) frequent, habitual and continuous informal acknowledgments in public or private conversations in which the purported father unequivocally acknowledged the child as his;
(2) the existence of private writings in which the purported father may have acknowledged the child or evidence that the purported father caused the child to be *509 educated as his or supported the child as his; or
(3) evidence that the mother of the child was known as living in a state of concubinage with the purported father, and resided as such in his house when the child was conceived;
then vague "reputation" or "rumor" evidence from unidentified sources, as well as declarations of the deceased mother pertaining to the purported identity of the father, is insufficient to prove paternity.
In summary, the evidence in this case reveals that Rayvenita Thomas purports to prove her paternal filiation based on the following:
1. Hearsay knowledge and purported general rumor evidence in the community from mostly unnamed sources;
2. Hearsay declarations of her deceased mother; and
3. Two purported, questionable oral "acknowledgments."
Opposed to this, in addition to the testimony of the "Foster Henderson Group," we find:
1. Rayvenita is presumed to be the legitimate daughter of Bobbie and Waverly Markham;
2. Evidence that Waverly and other men were on the scene at the time of Rayvenita's conception;
3. A lack of a birth certificate and/or private writings in which Moody acknowledged Rayvenita as his child;
4. Rayvenita was not reared in the home of Moody Henderson, educated by Moody Henderson; or supported by him; and
5. Lack of any evidence that Bobbie Markham and Moody Henderson lived together as man and wife or in open concubinage; and
6. No formal acknowledgement was made in compliance with La. C.C. Art. 203.
Based on the above discussed jurisprudence and the law in effect at the time of the trial of this suit, we can only conclude that Rayvenita Thomas has failed to prove her claim by a preponderance of the evidence. Proof by a preponderance of the evidence means that taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not. Prestenbach v. Sentry Ins. Co., 340 So.2d 1331 (La.1976). Proof which establishes only possibility, speculation, or unsupported probability does not suffice to establish a claim. Thibodeaux v. St. Joseph Hospital, 276 So.2d 703 (La.App. 1st Cir. 1973). Mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it is established with reasonable certainty that all other alternatives are impossible. Lutheran Church of the Good Shepherd v. Canfield, supra. One relying on circumstantial evidence is required to produce evidence which excludes, with a fair amount of certainty, every reasonable hypothesis but the one relied on. Braud v. Kinchen, supra.
Applying the foregoing to the instant case, we can only conclude that Rayvenita Thomas' claim that she was the biological daughter of Moody Henderson was not proved to be more probable than not, and the trial court was clearly wrong in its finding with respect thereto.
Accordingly, that portion of the judgment of the trial court rejecting the demand of Cartelyons Jacobs, Mary Jacobs Hall, Martha Jacobs Williams, Fletcher Jacobs, Jr., Ollie Patricia Jacobs Wilson, Carolyn Jacobs Armstrong and Lois Jacobs Lee is affirmed; and that portion of the judgment in favor of Rayvenita Henderson Thomas, Kent Upson and Todd Upson is reversed.
*510 The legal heirs of Charlie Henderson and Martha Ann Carr Henderson are:
a. Foster Henderson (¼ interest)
b. Charlie Mae Henderson White (¼ interest)
c. Leatha Henderson Horn (¼ interest)
d. Geraldine Henderson Williams; Emma L. Henderson; Charles E. Henderson; John Paul Henderson; and Rose Marie Henderson, inheriting by representation from their deceased father, Sandy Henderson (¼ interest to be divided equally among the descendants of Sandy Henderson).
This case is remanded to the district court to determine the oil, gas and mineral interests in the North Half of Section 23, Township 13 North, Range 15 West, DeSoto Parish, Louisiana, devolving from the legal heirs of Charlie Henderson and Martha Ann Carr Henderson, subject to any oil, gas and mineral leases and/or sales of record by the legal heirs named above in accordance with this opinion.
AFFIRMED in part, REVERSED in part and REMANDED.
*511 
NOTES
[1] In a previous, unpublished opinion, we concluded that implicit in the trial court's ruling and the resulting judgment was its holding that La. C.C. Art. 921, then in effect, was unconstitutional; and therefore, we lacked jurisdiction in this matter under Article 5 Section 5(D) of the Louisiana Constitution of 1974. Therefore, we transferred this appeal to the Louisiana Supreme Court. Thereafter, by order dated April 30, 1982, the Supreme Court reversed our ruling on jurisdiction without explanation simply stating:

"The judgment of the Court of Appeal on the question of its jurisdiction (and the ruling transferring the case to the Supreme Court) is reversed and this case is remanded to the Court of Appeal."
[2] Mary Jacobs Hall, Cartelyons Jacobs, Martha Jacobs Williams, Ollie Patricia Jacobs Wilson, Carolyn Jacobs Armstrong, Lois Jacobs Lee and Fletcher Jacobs, Jr.
[3] Foster Henderson, Charlie Mae Henderson White, Leatha Henderson Horn, Geraldine Henderson Williams, Charles E. Henderson, Emma Lee Henderson, John Paul Henderson, Rose Marie Henderson, John S. Simonton, Eva Rodgers Simonton, and May Petroleum, Inc.
[4] This assignment concerns the issue of the retroactive application of Succession of Brown, 388 So.2d 1151 (La.1980), which at this writing has been answered by our Supreme Court in Succession of Clivens, ___ So.2d ___ (La. 1982), handed down on July 2, 1982, in which the court stated:

"An acknowledged illegitimate or one who proves filiation has, under Brown, the same rights as a legal heir. However, those rights are only partially retroactive. Retroactive claims against third parties and testate successions are precluded. In the interest of justice and equal treatment, Brown is to be retroactive in intestate successions where the rights of third parties are not involved."
We further note that an application for rehearing was filed in that case on July 16, 1982, and is presently pending before the court.
[5] Prior to Act 430 of 1976, Article 184 read as follows:

"The law considers the husband of the mother as the father of all children conceived during the marriage."
After the 1976 amendment referred to above, Article 184 read as follows:
"The husband of the mother is presumed to be the father of all children born or conceived during the marriage."
Additionally, Article 187 now reads as follows:
"The husband can disavow paternity of a child if he proves by a preponderance of the evidence any facts which reasonably indicate that he is not the father."
For an interpretation of the significance of these amendments see Mock v. Mock, 411 So.2d 1063 (La.1982), where the Supreme Court recognized that the amendments were an effort by the legislature to moderate the former statutory and jurisprudential rules which made the presumption of Article 184 "the strongest presumption known in law." However, the court interpreted the new amendments to still require a stronger burden of proof than a preponderance of the evidence. At page 1066 the court stated:
"This indicates that the legislature was not satisfied with a mere requirement that the husband could disavow a child by a preponderance of any type of evidence, like the burden in most other civil cases. Rather, the legislature intended a different type of burden, that the husband could only rebut the paternity presumption by proof by a preponderance of the evidence of facts which indicate that he is not the father of the child.
* * * * * *
The wisdom of the Legislature's broadening the permissible proof in paternity disavowal cases, although restricted to evidence of scientific facts and physical circumstances, while retaining the presumption of paternity and a heavier than usual burden of proof, is made evident by the advances in scientific testing in this field of the proof and/or disproof of paternity."
Under the past and present state of the law, Waverly Markham is nonetheless presumed to be the legal father of Rayvenita Thomas. Thus, as the law now exists, unless the present Article 208 prohibits a presumed legitimate child from proving paternal filiation as other than that of the child of its presumed father, which may be contrary to Succession of Mitchell and Warren v. Richard, infra, the standard of proof for a husband to disavow a child is more stringent than that afforded a child presumed legitimate, as in the instant case, to prove its biological father is someone other than the presumed father.
[6] La. C.C. Art. 203 provides:

"The acknowledgment of an illegitimate child shall be made by a declaration executed before a notary public, in the presence of two witnesses, by the father and mother or either of them, or it may be made in the registering of the birth or baptism of such child." As amended 1979 Acts No. 607.
[7] Act No. 549 of 1980, which became effective July 23, 1980, subsequent to the filing and trial of the instant proceeding amended Articles 208 and 209 of the Louisiana Civil Code and repealed Article 210 of the Louisiana Civil Code. After this amendment these articles read as follows:

Art. 208
"Illegitimate children, who have not been acknowledged as provided in Article 203, may be allowed to prove their filiation."
Art. 209
"1. An illegitimate child may be entitled to a rebuttable presumption of filiation under the provisions of this Article. Or any child may establish filiation, regardless of the circumstances of conception, by a civil proceeding instituted by the child or on his behalf in the parish of his birth, or other proper venue as provided by law, within the time limitation prescribed in this Article.
2. A child who is shown to be the child of a woman on an original certificate of birth is presumed to be the child of that woman, though the contrary may be shown by a preponderance of the evidence.
3. An illegitimate child not shown as the child of a woman on an original certificate of birth may prove filiation by any means which establish, by a preponderance of the evidence, including acknowledgment in a testament, that he is the illegitimate child of that woman.
4. A child of a man may prove filiation by any means which establish, by a preponderance of the evidence, including acknowledgment in a testament, that he is the child of that man. Evidence that the mother and alleged father were known as living in a state of concubinage and resided as such at the time when the child was conceived creates a rebuttable presumption of filiation between the child and the alleged father.
5. Proof of filiation must be made by evidence of events, conduct, or other information which occurred during the lifetime of the alleged parent. A civil proceeding to establish filiation must be brought within six months after the death of the alleged parent, or within nineteen years of the illegitimate child's birth, whichever occurs first. If an illegitimate child is born posthumously, a civil proceeding to establish filiation must be instituted within six months of its birth, unless there is a presumption of filiation as set forth in Section 2 above. If no proceeding is timely instituted, the claim of an illegitimate child or on its behalf to rights in the succession of the alleged parent shall be forever barred. The time limitation provided in this Article shall run against all persons, including minors and interdicts."
Thereafter, by Act. No. 720, § 1 of 1981, Articles 208 and 209 were again amended and now read as follows:
Art. 208
"In order to establish filiation, a child who does not enjoy legitimate filiation or who has not been filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must institute a proceeding under Article 209."
Art. 209
"A. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgement under Article 203 must prove filiation by a preponderance of the evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this Article.
B. The proceeding required by this Article must be brought within one year of the death of the alleged parent or within nineteen years of the child's birth, whichever first occurs. This time limitation shall run against all persons, including minors and interdicts. If the proceeding is not timely instituted, the child may not thereafter establish his filiation."
We note in passing that under the new Article 208, since Rayvenita Thomas enjoys legitimate filiation, she might well, under the intent of the present law, be precluded from asserting her claim as an illegitimate.
[8] Certainly, the testimony of M. T. Wilson, a man of advanced age, obviously flawed with an inability to recall events which happened over fifty years prior to his testimony, is not sufficiently reliable to prove the paternity of Rayvenita Thomas by a preponderance of the evidence. This is the same witness the trial judge quoted in his Reasons for Judgment as establishing the uncertainty that Sophia Williams Jacobs was not Martha Henderson's daughter. It is significant to note that Mr. Wilson testified "I don't know who Sophia's momma was;" yet, on the same page pursuant to a leading question by the attorney for the Jacobs' Heirs contradicted himself by testifying that Sophia was Martha's child born to her before her marriage to Charlie Henderson. Obviously, he was not testifying based on his own personal knowledge because he thereafter stated in response as to how he knew this, "I heard all the old folks say."
[9] Foster Henderson, Leatha Henderson Horn, Charlie Mae Henderson White, and L. E. Jackson.
[10] One of Rayvenita's daughters would have been about four months old when Moody died July 10, 1946.